IsGOTHARD, Judge.
This is an action in negligence for injuries sustained by a patient of Ochsner Foundation Hospital (Ochsner). After a trial on the merits, the trial court found for plaintiff in the amount of $12,000.00. Defendant, Ochsner, has appealed the judgment. Plaintiff, Robert Webre, has filed an answer to the appeal. For reasons that follow, we reverse.
At trial, plaintiff, Robert Webre, testified that in February, 1997 his wife, Donna, began suffering severe headaches. She was also experiencing difficulty with *147 speech and writing, and memory loss. On February 5, 1997 Mrs. Webre underwent a CAT scan at Ochsner Hospital, which revealed a brain tumor. She was admitted into the hospital and surgery to remove the tumor was performed on February 7, 1997. Mr. Webre and the couple’s two daughters, Christy and Judy, were encouraged immediately after the | ¿surgery when Mrs. Webre came out of the surgery “feisty”. Unfortunately, a subsequent biopsy resulted in the diagnosis of an incurable malignancy. The tragic news devastated the family members, who were now required to make heart-rending decisions on the best course of treatment for Mrs. Webre. Mrs. Webre elected to have radiation treatment, and was doing well for about one month after the surgery. During that period, Judy was helping her mother with personal hygiene needs.
On March 14, 1997, Mr. Webre noticed his wife seemed weaker than usual when he took her in for her daily radiation treatment. After the treatment the couple went to visit a friend in the hospital and drove home. Later that evening, Judy noticed that one side of Mrs. Webre’s face was “quivering”, and she seemed unable to speak. Later that evening, Mrs. Webre passed out and was brought to the hospital. Shortly after she arrived, she had a grand mal seizure and was taken into the emergency room for treatment. She was subsequently admitted to the hospital.
On March 16, 1997 she was sedated and resting comfortably. The next evening, she was awake and alert and discussing family matters with her daughters. According to Mr. Webre, it was the last time she was coherent. On the 17th Mrs. We-bre began physical therapy. She was unable to carry on a conversation, but was responsive. The next day she was slightly improved.
Mr. Webre testified that he left the. hospital at about 4:00 p.m. on March 18, 1997. Later that evening he received a telephone call from Dr. Laura Young who informed him that his wife had been struck in the head by a grate which fell from the ceiling of an elevator. Mrs. Webre was being transported from physical therapy back to her room when the incident | occurred. Dr. Young called back shortly afterward to inform Mr. Wqbre that another .CAT scan was being conducted on. his wife.
When Mr. Webre returned to the hospital, his wife was unresponsive. He observed a bruise on the top of her head. She was released from the hospital on March 24 th. Mr. Webre stated that his wife never returned to her “old self’. Mrs. Webre died on June 13,1997.
The court also heard testimony from Judy Webre Chaisson, who testified that she lived three doors down from her parents and visited her mother every day. She chronicled her mother’s illness with testimony which corroborated that of her father. She stated that her mother was alert and able to carry on a normal conversation with family members on March 16th . Mrs. Chaisson testified that she did not see her mother again until the evening of March 18th. She arrived at the hospital in the evening after being informed of the accident. She found her mother asleep and unresponsive. From that time until her death on June 13th, Mrs. Webre did not recognize her family members. Mrs. Chaisson described her mother as “childlike”. Mrs. Webre was unable to feed or dress herself, and required constant care. It was necessary for Mrs. Chaisson to bathe and groom her mother as she was unable to attend to basic hygiene needs herself.
When questioned about the injury her mother sustained from the falling grate, Mrs. Chaisson testified that she observed redness on the left side of the head above the surgical scar. She described the area as a large, bruised area.
On cross-examination, Mrs. Chaisson admitted that her mother was disoriented on March 14th, before the incident in question. On the next day, |Kher mother was drowsy and non-verbal. However, she was *148 responsive. She would nod and smile when spoken to by family members.
The court also heard testimony from Marcus Campbell, who was employed by Ochsner Hospital on March 14, 1997. He testified that he was transporting Mrs. Webre from her room to physical therapy when the grate over the light fixture in the elevator fell and hit her on top of the head. She cried out in pain. Mr. Campbell rushed Mrs. Webre to the department of physical therapy and told the therapist, who checked the patient and wrote an incident report. Mr. Campbell testified that Mrs. Webre did not lose consciousness and was not cut in the incident. Mr. Campbell further stated that he transported Mrs. Webre before and after the incident and did not notice any change in her behavior as a result of the accident.
' The record contains Mrs. Webre’s medical records for both the February and the March hospital stays. The medical record of the emergency room visit on March 14th shows that the medical history given indicates Mrs. Webre was “talking incoherently tonight” and passed out and hit her head.
The medical record indicates that Dr. Laura Young attended to Mrs. Webre after the accident on the 18th. The doctor observed a large red mark on the top of the head, and ordered a CT scan of the head. The doctor noted that the patient was “arouseable” and tried to answer questions. A note on the record dated March 15 th shows Mrs. Webre did not respond to painful stimuli. A nurse’s notation on March 16th shows that the patient was “lethargic, responding to verbal stimuli. After a great deal of stimulation, follows command slowly. Bilateral hand grasp after a great deal of | ^stimulation. Opens eyes to command, moves leg freely, however, not to command”.
The record also contains the deposition of Dr. Edward Coleman, the neurosurgeon who diagnosed and treated Mrs. Webre’s brain tumor in February of 1997. Dr. Coleman explained that a CAT scan of the brain revealed a large enhancing lesion in her left temporal lobe. In laymen’s terms Mrs. Webre had a malignant primary tumor of the left side of the brain. Dr. Coleman performed a left frontal temporal craniotomy, in which he opened the skull on the left side over the eye and temporal area. He used intraoperative ultrasound to identify the location of the tumor. The tumor was removed with an ultrasonic machine which vibrates at a very high rate of speed, breaking up the tissue and allowing it to be sectioned. Dr. Coleman stated that the survival rate for this type of tumor is three months to five years depending on factors such as the age and general health of the patient.
Dr. Coleman also stated that the grand mal seizure Mrs. Webre suffered on March 14th would certainly indicate a worsening of her condition. Dr. Coleman testified that Mrs. Webre’s level of consciousness improved slightly until March 19 th. On that day his notes show that Mrs. Webre looked better on March 19th than she did on the 17th. She was brighter and more alert, although her speech was still incoherent.
An MRI conducted on March 17th showed an infarct in the region of the left anterior cervical artery which is an area in which an insufficient blood supply results in the death of a portion of the brain. Dr. Coleman compared the results of the CT scan done after the accident with Mrs.
17Webre’s prior tests and found no physical evidence of change to her brain as a result of the ceiling grate falling on her head. It is Dr. Coleman’s opinion that the incident neither caused or contributed to any worsening of Mrs. Webre’s condition.
Dr. Coleman next saw Mrs. Webre on April 30, 1997, one week after her discharge from the hospital. At that time her family reported that she was still confused and using jargon speech, but was able to dress and feed herself. He saw her again on May 29 th. At that time Mrs. Webre was hospitalized in a semi-comatose state. *149 A CT scan done at that time showed a large recurrence of the left temporal lobe tumor. Because Mrs. Webre did not respond to the first surgery, Dr. Coleman determined a second surgery would not be helpful, and that Mrs. Webre’s illness was terminal.
Dr. Coleman testified that Mrs. Webre’s condition deteriorated in April and May of 1997. However, he opined that the worsening of her health was unrelated to the incident which is the subject of this lawsuit. He stated that the incident on March 18 th did not aggravate her condition, nor hasten or accelerate her demise. He further testified that the changes in Mrs. Webre’s condition were related to having a fulminating, very aggressive malignant tumor and not related to any minor head injury.
After reviewing all of the evidence the trial court rendered judgment in favor of plaintiff in the amount of $12,000.00 for loss of quality of life. It is clear from the judgment that the trial court made a factual finding that the accident which occurred while Mrs. Webre was under Ochsner’s care was not an aggravating'or contributing cause of her death.
IsLSA-C.C. art. 2322 provides as follows:
The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice or defect in its original construction. However, he is answerable for damages only wpon a showing that he knew or, in the exercise of reasonable care, should have known of the vice or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case. (Emphasis added)
On appeal, Ochsner argues the doctrine of res ipsa loquitur does not apply, and the plaintiff failed in his burden of proof to show negligence. We agree. The above cited code article, which was in effect at the time of the injury, changed the law from the previous rule of strict liability to negligence. The law as applicable now requires a showing that the defendant knew or should have known of the defect. The mere showing that a defect existed which caused the injury is insufficient to carry the burden of proof.
The evidence offered at trial goes to causation and extent of damages. It does not address the essential element of knowledge of the defect. There was no showing at trial which would impact the knowledge requirement of the code article. Thus, an essential element necessary to find liability is absent. Accordingly, we must reverse the trial court.
Because we reverse the ruling and find for the defendant, we pretermit discussion of the issues presented by plaintiffs answer.
REVERSED.
CHEHARDY, J. Dissents.